IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

MAR 31 2021
Clerk, U.S. Courts
District of Montana
Missoula Division

CIVIL ACTION NO. ____________________

BRIAN TACKETT, PLAINTIFF

Vs.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES,
LOGAN HEALTH,
WILLIAM T. HIGHFILL, M.D.,
DESIREE ALLEN, F.N.P.,
JAY MAHONEY, M.D.,
MARK HARDIN, M.D.,
CABINET PEAKS MEDICAL CENTER,
PROVIDENCE SACRED HEART
MEDICAL CENTER, and
KAVITHA CHAGANUR, M.D.,

DEFENDANTS

## COMPLAINT FOR JURY TRIAL

1. Comes now the Plaintiff with complaint against the Defendants for: 1) wealth based discrimination in the administration of health care services in violation of the Equal Protection guarantees of the Federal constitution and controlling federal law, pursuant to Title 42 USC 1983; and a pendent state law tort

claim for loss of consortium of his deceased spouse, based on wrongful death due to medical malpractice, which was substantially caused by the afore-claimed discrimination and violation of federal law, pursuant to the common law of Montana, the Montana Constitution, Section 40–2–101, MCA, and 42 USC 1983.Plaintiff also challenges the constitutionality of Montana Statute 25-9-411 as applied in this case. In support of this Complaint, Plaintiff states:

JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to Title 42 United States Code Section 1983 and 28 U.S.C. Section 1367.

3. This Court has venue pursuant to Title 28 U.S.C. Section 1391(b) (2) because a majority of the Defendants reside in this District and a majority of the actions giving rise to this complaint occurred in Lincoln County, Montana.

PARTIES

4. Plaintiff Brian Tackett is a resident of Lincoln County, Montana.

5. Defendant United States Department of Health and Human Services is a department of the United States of America.

6. Defendant Montana Department of Public Health and Human Services is a department of the State of Montana.

7. Defendant Logan Health is a Montana based association.

8. Defendant William T. Highfill is a Montana licensed doctor.

9. Defendant Desiree Allen is a Montana licensed Family Nurse Practitioner.

10. Defendant Cabinet Peaks Medical Center is a Montana based association.

11. Defendant Jay Mahoney is a Montana licensed doctor.

12. Defendant Mark Hardin is a Montana licensed doctor.

13. Defendant Providence Sacred Heart Medical Center is a Washington based association.

14. Defendant Kavitha Chaganur is a Washington licensed doctor.

INDESPENSIBLE PARTIES

15. The Estate of Robbie Ann Tackett is an indispensable party to this action.

16. G. Tackett, a minor, is an indispensable party to this action.

17. G. Tackett, a minor, is an indispensable party to this action.

18. Kaitlyn Owen, an adult heir, is an interested party to this action.

19. The Montana Attorney General is an indispensable party to this action.

SPECIAL MATTERS AFFECTING JURISDICTION

20. The Estate of Robbie Ann Tackett filed for review of the pendant Montana State law medical malpractice claims before the Montana Medical Legal Panel, Claim Number 2022100044. No decision has been rendered.

21. The Montana Medical Legal Panel declined to accept jurisdiction over the loss-of-consortium claims by Plaintiff individually, or by his minor children.

22. The Panel declined to accept jurisdiction over the Defendants Providence Sacred Heart and Desiree Allen, FNP.

23. Because Robbie died July 31, 2019, all actions based on that loss are barred if not presented before July 31, 2021.MCA 27-2-205.

24. Whether an Application for Review before the Panel tolls the applicable statute of limitations as to other claims, claimants, and defendants is unclear under Montana law. As a result, there is no clear state law bar to the institution of this action.

25. Because this action challenges a Montana Statute, notice to the Attorney General and the Montana Supreme Court is required.

## STATEMENT OF FACTS

*Summary*

26. Robbie Ann Tackett, a resident of Lincoln County, Montana, died on July 31, 2019 of cardiac arrest from heart arrhythmia while visiting her dying mother in Mississippi. Robbie was 51 years old; she left behind her husband of 10 years, their nine-year-old son, and their six-year-old daughter. Robbie is also survived by her adult daughter, one sister, and one brother.

27. Robbie was treated for this heart condition by the Defendants on many occasions before her death. The claims here are that medical malpractice was a significant cause of Robbie's premature death and that the malpractice was significantly caused by the wealth-based discriminatory practices and customs in use by these defendants, in violation of federal and state law.

28. As it applies to the following, the applicable medical standard of care for a patient with an ejection fracture below 30% is to test and monitor for dangerous heart arrhythmias. Exhibit A, *attached* (Opinion Letter of Dr. Stark, dated February 12, 2021). Robbie's first visit to the Defendants led to the discovery that her ejection fracture was 20%. All of the Defendants were aware of that fact. Treatment was available to prevent death from heart arrhythmia, however, at no point was said treatment administered.

ACTIONS OF DEFENDANTS CABINET PEAKS MEDICAL CENTER AND DOCTORS MAHONEY, HARDIN, AND HIGHFILL

31. On February 23, 2018, at 12:22 AM, approximately 18 months prior to her unexpected death, Robbie entered the emergency room of the Cabinet Peaks Medical Center (hereinafter "Cabinet Peaks") in Libby, Montana, with shortness of breath and swelling all over her body. She was admitted to the hospital by Jay Mahoney, M.D. She was diagnosed with heart failure. An echocardiogram confirmed that Robbie had an ejection fracture of 20% (normal is 50 -60%). Treatment was started with medications. Testing was performed regarding this condition, and although the records note that heart arrhythmia was suspected, and telemetry monitoring was performed while Robbie was in the hospital, this testing and monitoring for heart arrhythmia did not continue past her discharge on February 24, 2018. She was released and told to await a call from someone to schedule a visit with a cardiologist.

*Claims- Montana State law medical malpractice*

*One*

32. Under these facts, Dr. Mahoney and Cabinet Peaks had the duty to thoroughly test and monitor for heart arrhythmias, including monitoring Robbie

after discharge by telemetry or Holter monitor, to detect life threatening arrhythmia.

*Two*

33. Nine days later, on March 3, 2018, at 11:44 PM, Robbie again entered the Cabinet Peaks ER with shortness of breath and swelling. This time she was admitted by Mark Hardin, M. D., and treated for heart failure. On March 4, 2018, while Robbie was a patient within Cabinet Peaks, Dr. William T. Highfill, an employee of Logan Health in the Rocky Mountain Heart and Lung department, consulted Robbie in the imaging department of Cabinet Peaks, and thereafter specifically canceled Robbie's scheduled stress test. He scheduled her for a visit at his office the following morning. Robbie was discharged with medications only.

34. During this visit to Cabinet Peaks, Doctor Hardin and Doctor Highfill should have ordered the tests necessary to detect Robbie's arrhythmia. Specifically, the stress test should not have been cancelled. Also, the monitoring of heart arrhythmia should have continued after Robbie's discharge.

## ACTIONS OF DEFENDANTS PROVIDENCE SACRED HEART MEDICAL CENTER AND DOCTOR KAVITHA CHAGANUR

35. On October 31, 2018, at 11:12 PM, Robbie again walked into the ER at Cabinet Peaks with shortness of breath, swelling and signs of a stroke. Robbie was

transferred, at the request of Defendant Providence Sacred Heart Medical Center ("Providence"), in Spokane, Washington, for possible surgery. Robbie was transported by ambulance on November 1, 2018 to Providence, and discharged from Cabinet Peaks.

36. On November 1, 2018, at 5:02 AM Robbie was admitted to the Providence Sacred Heart Medical Center, Emergency Department, in Spokane, Washington, and diagnosed and treated for heart failure and possible stroke. Providence routinely takes patients from Cabinet Peaks for treatments beyond the ability of Cabinet Peaks to administer. Robbie was treated until her release, on November 4, 2018, by Kavitha Chaganur, M.D.

37. Providence holds itself out in the medical community as a specialist in heart care. Its website proclaims it "[a]t the forefront of leading research, clinical trials, surgical and interventional cardiac care." As explained below, the care which followed Robbie's discharge from Providence was based in large part, however erroneously, on the lack of diagnosis and treatment Robbie received at Providence. By holding itself out as a specialist, Providence had a duty to treat Robbie above the generally accepted standard of care.

38. At the time Robbie arrived at Providence, as described below, Dr. William T. Highfill had already recommended that she receive a "BiV implant".

Had Providence and Dr. Chaganur reviewed Robbie's records they would have learned of this recommendation.

*Claim – Washington medical malpractice*

39. Defendants Providence and Kavitha Chaganur had the duty to research Robbie's medical history. Had they done so, they would have learned that an implant had been recommended. Providence and Dr. Chaganur had the means and opportunity to perform this procedure and also the duty to do it. Providence and Dr. Chaganur should have planted the "BiV implant". Providence should not have discharged Robbie on November 4, 2018 without that lifesaving treatment. Additionally, Providence should not have discharged Robbie without telemetry or Holter monitoring and instructions for subsequent health care providers treating Robbie to do the same. These failures breached the standard of care applicable to Providence and Dr. Chaganur as specialists in the field. This breach likely led to the later failure of the following health care providers to search for heart arrhythmia or to treat it.

ACTIONS OF LOGAN HEALTH, WILLIAM T. HIGHFILL, M.D. AND DESIREE ALLEN, F.N.P.

40. Defendant William T. Highfill, M.D. first saw Robbie and undertook the primary care of her heart condition on March 4, 2018 in the imaging department of

Cabinet Peaks. His recommendation to cancel the stress test and see Robbie in his office the following day was followed, and Robbie saw Dr. Highfill at his satellite office in Libby, Montana, on March 6, 2018.

41. At that time Dr. Highfill worked for the former Kalispell Regional Health Group, now Logan Health, in the Rocky Mountain Heart and Lung department, located in Kalispell, Montana. When Robbie was treated, Rocky Mountain Heart and Lung had a satellite office in Libby, Montana.

42. Dr. Highfill diagnosed Robbie with congestive heart failure. He maintained the medication regiment started by Cabinet Peaks and recommended an implant to resynchronize Robbie's left ventricle function if it had not "significantly improved" following drug treatment. He was "fairly optimistic" that Robbie's left ventricle function could be improved. He requested a follow up visit and sought to obtain Robbie's past medical records to confirm his diagnosis.

43. Dr. Highfill failed to procure Robbie's records. Had he done so, he would have learned that Robbie had a family history of heart disease on both her mother and father's side. The failure to procure that information was below the standard of care.

44. On March 20, 2018, Dr. Highfill saw Robbie for the last time. In this visit he recommended that she be seen by "Nikke Allen" for medication

adjustments and a follow up echocardiogram after "she has been on maximally tolerated medications for around six weeks."

45. "Nikke Allen" is Desiree Allen, a Family Nurse Practitioner, (FNP), licensed in 2016. Upon information and belief, she is not and never has been a doctor and she has no specialized training in heart disease or care. Robbie, however, believed that Nikke Allen was a doctor working with Dr. Highfill and that she was a specialist. All of Robbie's medication prescribed by Nurse Allen clearly identified her, erroneously, as "Dr. Desiree Allen". This erroneous representation was never corrected.

46. Nurse Allen first saw Robbie on April 3, 2018. As recommended by Dr. Highfill, Nurse Allen worked on "up titrating her medications to optimal doses." Nurse Allen also recommended discontinuance of some of Robbie's medications to "see how she tolerates it." There is no indication that Nurse Allen was following the recommendations of Dr. Highfill, or any other doctor, in making medicinal adjustments beyond those recommend by Dr. Highfill.

47. Nurse Allen next saw Robbie on April 17, 2018. Nurse Allen continued the medicinal treatment and recommended a follow-up visit in about a month. Robbie was not personally seen again by Nurse Allen, or any other medical

professional, until she was again admitted to Cabinet Peaks' ER and later transferred to Providence, on October 31, 2018, as set out more fully above.

48. On November 9, 2018, Nurse Allen saw Robbie following the recommendations of Providence that she follow up with her heart doctor. At this visit Nurse Allen modified Robbie's medicine regimen and recommended a follow up in a week. She continued Dr. Highfill's original recommendation to up titrate the medicines. Neither Dr. Highfill nor any other licensed doctor was involved in this visit or treatment.

49. On November 19, 2018, Nurse Allen again saw Robbie, adjusted her medicines, and recommended a follow up visit in one week. Again, there was no licensed doctor involved in this visit or in this treatment.

50. On November 28, 2018, Nurse Allen again saw Robbie. This time Nurse Allen decided to "hold off increasing medicines at this time" and recommended a follow up in three weeks. Neither Dr. Highfill nor any other doctor was involved in this visit or this treatment.

51. On December 19, 2018 Nurse Allen saw Robbie and noticed some swelling. She adjusted her medicines and recommended she be back in one to two weeks. Neither Dr. Highfill nor any other doctor was involved in this visit or treatment.

52. On January 16, 2019, Robbie visited Nurse Allen for the follow up. The swelling had resolved and Nurse Allen made no changes to the medicines. Nurse Allen did, however, recommend the echocardiogram that Dr. Highfill had recommended almost a year earlier, on March 20, 2018. Neither Dr. Highfill nor any other doctor was involved in this visit or treatment.

53. On February 25, 2019, almost a month following the echocardiogram administered by Cabinet Peaks on January 30, 2019, Nurse Allen saw Robbie. Nurse Allen consulted the ECHO report and noted that Robbie's "EF is still significantly decreased, at 20%," and that she "discussed options" with Robbie. She recommended an angiotensin receptor-neprilysin inhibitor (ARNI); Robbie agreed, and Nurse Allen started Robbie on Entresto and discontinued lisinopril, with a recommendation to follow up in one month. It was noted that this medicine was changed per "Doctor's Order," however, no doctor was involved in this visit or treatment.

54. On May 3, 2019, Nurse Allen saw Robbie. At this visit she noted that Robbie was "hypotensive, but asymptomatic," and that she was going to try to increase the Entresto if Robbie's "BP will tolerate" it. No doctor was involved in this visit or treatment.

55. On June 7, 2019, Robbie saw Nurse Allen for the last time. At this final visit, Nurse Allen recommended up titrate of the medicine and a follow up in six weeks. Again, no doctor was involved in this visit or treatment.

56. Before her next visit with Nurse Allen, Robbie died of cardiac arrest secondary to sever cardiomyopathy, specifically heart arrhythmia. Exhibit A.

*Claims – Montana State law medical malpractice*

*One*

57. Nurse Allen and Dr. Highfill had the duty to care for Robbie. On each single occasion listed above, Nurse Allen and Dr. Highfill had an opportunity to render the standard of care by sufficiently testing and monitoring for heart arrhythmia. Had those procedures been given, the arrhythmia would have been detected and treated. Arrhythmia can be successfully treated with drug therapy and or implantable devices. This treatment would have prevented Robbie's premature death by cardiac arrest due to arrhythmia.

*Two*

58. Dr. Highfill failed to install the BiV implant according to his recommendation in March 2018. Had that implant been made, Robbie would not have died from heart arrhythmia. The failure to follow through with this procedure

was below the standard of care and a significant and direct cause of the failure of Robbie's heart to improve and of her premature death from this curable condition.

*Three*

59. Nurse Allen failed to clearly disclose that she was not a doctor and that her treatment was neither supervised nor reviewed by a doctor. Doctor Highfill had a duty to supervise Nurse Allen to ensure that the proper level of care was given, and that Nurse Allen was not practicing medicine outside the law. Nurse Allen was, in fact, doing so by treating Robbie for a serious heart condition without the proper training or supervision, by failing to fully disclose her qualifications and license category to Robbie, and by consulting with her, *to wit*, "discussing options" regarding the treatment of her deadly condition. The misrepresentation and failure to correct same by Defendant Desiree Allen regarding her status as a FNP, and not a doctor, constituted the unlicensed practice of medicine under the Administrative Rules of Montana (ARM) 24.156.625 (1) (e)-(f), which states that it is unprofessional conduct for a licensee or license applicant to "[resort] to misrepresentation[...] in the examination or treatment of a person," or to use "a false, fraudulent, or deceptive statement in any document connected with the practice of medicine."

60. This misrepresentation and violation of law by Defendant Desiree Allen resulted in Plaintiffs' unwarranted confidence in the treatments being given, the medications being prescribed, and the level of care afforded by Defendant Desiree Allen. This conduct wrongfully deprived Robbie Tackett of the protection of the law from treatment by unlicensed physicians, and wrongfully deprived her, by subterfuge and deception, of the ability to effectively seek and receive lifesaving medical treatment, ultimately resulting in her premature death.

## CLAIM FOR WEALTH-BASED DISCRIMINATION IN VIOLATION OF THE RIGHT OF EQUAL TREATMENT AND FEDERAL LAW

61. Had Dr. Highfill's recommendation for a BiV implant been timely followed, it is more likely than not that Robbie's left ventricle function would have improved, as he opined, and that she would not have suffered the stroke on October 31, 2018, or died prematurely ten months later.

62. Upon information and belief, the failure to treat Robbie with an implant was the direct result of policies and customs that the Defendants Logan Health, Providence Sacred Heart, and Cabinet Peaks instituted and kept in force as a result of the application of the reduced Medicaid Reimbursement plans for treatments available under Medicaid. Because Robbie did not have the co-pay amount required by Montana Medicaid to cover the cost of a heart implant, she was denied

that treatment. The only reason Montana Medicaid does not cover the entire cost of said implants is because they are classified as prosthetic devices, and even then, a doctor's recommendation that such a device is "medically necessary' is required *ab initio*. In actual practice, where a health care provider implants a prosthetic device, only 80 percent of the total cost can be realistically collected. This puts the heath care providers to the *loss* for the actual cost of the device, plus the surgeon's fee. This leads naturally to the reluctance of health care providers to install pacemakers in patients insured by Medicaid, and to delay treatment until they die.

63. This discriminatory practice resulted in the unequal level of treatment afforded Robbie in this matter. Simply put, because Robbie was insured by Medicaid Montana, she was not afforded the same level of treatment generally afforded wealthy patients.

64. The installation of a pacemaker attached to Robbie's heart would have prevented her premature death from her heart condition, and likely would have improved same.

65. Title XIX of the Social Security Act is a federal-state matching entitlement program that pays for medical assistance for certain vulnerable and needy individuals and families with low incomes and resources. Medicaid became law in 1965 as a jointly funded cooperative venture between the federal and state

governments, to assist states furnishing medical assistance to eligible needy individuals. Medicaid is the largest program funding medical and health-related services for America's poorest people.

66. Within broad national guidelines established by federal statutes, regulations and policies, each state: 1) Establishes its own eligibility standards; 2) Determines the type, amount, duration, and scope of services; 3) Sets the payment rate for services; and 4) Administers its own program.

67. Medicaid is administered in joint cooperation by Federal and State governments. This is accomplished cooperatively with the Field Offices of Public Assistance and processing centers providing the day-to-day client contact under state policies. The Federal government provides guidelines for state operations.

68. Medicaid is a cooperative Federal–State program with the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish "medical assistance on behalf of ... individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396.

69. States choosing to participate in the program must develop a medical assistance plan meeting the approval of the federal Secretary of Health and Human Services.

70. A participating state receives federal reimbursement for medical assistance that it renders under its approved plan.

71. The medical assistance provided by a state plan must include certain minimum services to "all individuals" who are financially eligible. 42 U.S.C. § 1396a(a)(10)(A).

72. A State plan for medical assistance must provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them. 42 U.S.C.A. § 1396a (a)(1).

73. The plan must provide (A) such methods of administration … as are found by the Secretary to be necessary for the proper and efficient operation of the plan. 42 USC 1396a(a)(4).

74. The plan must provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals. 42 USC 1396a(a)(8).

75. Among the medical services that must be provided to all individuals who qualify,(42 USC 1396a(a)(10)) are inpatient hospital services(42 USC 1396d(a)(1)) and any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the

healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level. 42 USC 1396d(a)(13)(C).

76. A state plan must also provide "reasonable standards ... for determining ... the extent of medical assistance under the plan," 42 U.S.C. § 1396a(a)(17), and must include necessary safeguards to assure that eligibility for services is provided "in a manner consistent with … the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

77. Medicare coverage for Pacemakers is available only when "medically necessary."

78. Pacemakers are incredibly reliable devices that aid in the treatment of heart arrhythmia.

79. Arrhythmia or atrial fibrillation is an irregular heartbeat in which the heart can beat either too slow or too fast.

80. A pacemaker is programmed especially for the patient's medical condition and needs. The device comprises a battery, electrodes, and a generator. The electrodes attach to the patient's heart and sense the patient's heart rate. The electrical pulse the device puts off helps to correct the irregular heartbeats.

81. Pacemakers are classified by Defendants DPHHS and DHHS as prosthetic devices, and as such, only reimburse 80% of the total costs of this life saving treatment.

82. Additionally, reimbursement is only available as follows:

> "Reimbursement for prosthetic devices, durable medical equipment, and medical supplies will be limited to items included on the department's fee schedule delivered in the most appropriate and cost-effective manner. Montana Medicaid adopts Medicare coverage criteria for Medicare covered durable medical equipment [....] The items must be medically necessary and prescribed[...]by a physician or other licensed practitioner of the healing arts within the scope of his practice as defined by state law."
>
> Mont. Admin. R. 37.86.1802(2).

83. Upon information and belief, private health insurance generally covers the entire cost of pacemakers in Montana.

84. The classification of pacemakers as prosthetic devices is irrational and not based on any realistic relationship with medical realities.

85. By classifying pacemakers as prosthetic devices, Defendants DPHHS and DHHS deprived Robbie Tackett of life saving medical assistance, and continue to deprive similarly situated individuals of the same.

86. This deprivation is not consistent with the best interests of Medicaid recipients, and is inconsistent with 42 USC 1396a (a)(19).

87. Federal law provides a personal right to those who qualify, like Robbie, for the acute and necessary treatment at the State's expense. 42 USC 1396 et seq. The regulatory inclusion of pacemakers in the category of non-life-threatening treatments (non-acute and not otherwise necessary treatment), that is, prosthetic devices, by the Defendants Montana Department Of Public Health And Human Services, and the United States Department Of Health And Human Services, arbitrarily deprived Robbie Tackett, and arbitrarily deprives all persons, of the same basic human and statutory right to receive lifesaving treatment through a pacemaker. There is no rational basis for the treatment of a pacemaker procedure as non-essential to the immediate preservation of life, such that only partial payment is made therefore, thereby depriving qualifying persons of the treatment. This irrational classification of heart implants affects similarly situated persons differently solely based on their wealth, *namely*, indigent versus wealthy congestive heart failure patients in Montana.

88. On or before February 2018, and ongoing, in Lincoln County, Montana, and in Spokane County, Washington, the Defendants Logan Health, Providence Sacred Heart Medical Center, and Cabinet Peaks have undertaken policies and customs of discriminatory treatment of their patients in the level of care afforded for life threatening illnesses, and the procedures to be given in the treatment thereof, to the detriment of Robbie Ann Tackett and Plaintiff. These policies and customs exist solely due to the economic influence on these Defendants generated by the lower level of reimbursement that the Defendants Montana Department of Public Health and Human Services, and the United States Department of Health and Human Services provide to the hospitals, doctors and nurses. Specifically, Medicaid fails to *fully* reimburse for a heart implant, a life saving device. As a result of this discriminatory treatment Robbie Tackett was not given a lifesaving procedure recommended by Dr. Highfill, and to which she had a federal statutory right. As a result, Robbie Tackett died prematurely from a treatable condition, depriving Plaintiff of her consortium.

MONTANA CODE SECTION 25-9-411 IS UNCONSTITUTIONAL AS APPLIED TO THISCIVIL SUIT

89. Montana Code Section 25-9-411 limits the noneconomic damages available for loss of consortium based on wrongful death by medical malpractice. This provision violates the Montana Constitution and the Constitution of the

United States of America: 1) insofar as it denies Plaintiff a full and complete redress for the loss of his wife; and 2), insofar as it treats Plaintiff unequally with other similarly situated plaintiffs by failing to provide for inflationary adjustment.

90. The statute states, in part:

> "(1)(a) In a malpractice claim or claims against one or more health care providers based on a single incident of malpractice, an award for past and future damages for non economic loss may not exceed $250,000. All claims for noneconomic loss deriving from injuries to a patient are subject to an award not to exceed $250,000."
>
> Mont. Code Ann. § 25-9-411 (West 2021).

91. The damage limitation violates Montana's open courts guarantee. Article II, Section 16, of the Montana Constitution provides that "[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character." As applied here, by depriving Plaintiff of the complete economic remedy determined by a jury, MCA 25-9-411 violates Article II, Sec. 16 of the Montana Constitution.

92. The failure of MCA 25-9-411, enacted in 1995, to allow for inflation in its operation is unconstitutional as applied to the Plaintiff by depriving him of the equal protection of the law. A plaintiff who recovered the full value of this noneconomic damage limitation in 1995 is almost twice better off than Plaintiff will be today. The value of $250,000 in 1995 is $463,000 now. A person awarded a

judgment in 1995 would gain nearly twice the real value a person awarded the same judgment would receive today. This unequal treatment is not reasonably related to any legitimate State interest, in violation of U.S. Const. Amend. 14.

PENDANT WASHINGTON AND MONTANA STATE LAW CLAIMS FOR LOSS OF CONSORTIUM

93. Plaintiff incorporates all of the above herein.

94. From February 22, 2018 until July 31, 2019, the Defendants breached their duty of care owed to Robbie Ann Tackett in treating her heart condition, as particularly described above, including the negligence per se of Dr. Highfill and Desiree Allen FNP, and the failure of Defendant Providence and Dr. Chaganur to treat Robbie; said failures leading to the premature death of Robbie from a treatable condition, thereby depriving Plaintiff of Robbie Ann Tackett's companionship, sexual relations, business assistance, child rearing services, housekeeping services, and lifelong partnership and consultation.

RELIEF

95. Plaintiff prays that this Court will:

A. Strike down the Defendant agencies' regulatory schemes which provide only partial reimbursement for necessary health care services. Said

schemes promote wealth-based discrimination in the availability of necessary health care services to statutorily qualifying persons.

B. Strike down the Defendants' classification of heart implants as prosthetic devices;

C. Hold MCA 25-9-411 unconstitutional as applied to this matter;

D. Grant a trial by jury of all issues so triable;

E. Award all costs and expert witness fees necessary for the prosecution of this action;

F. Award compensatory damages in an amount to be determined by a jury;

G. Award exemplary damages where appropriate;

H. Award reimbursement for all medical costs to the State of Montana paid to these Defendants for treatment of Robbie's heart condition between February 2018 and July 2019; and

I. Award any other relief this Court deems necessary to correct the wrongs done.

Date: 3-29-21.

Respectfully submitted,

/S/________________________,

Brian Tackett
POB 448
Troy MT 59935