FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 01, 2026

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BRIAN TACKETT individually, as Personal Representative of the Estate of Robbie Ann Tackett, and as Guardian of Minor Children G.T. and G.T. <br><br> Plaintiff, <br><br> v. <br><br> PROVIDENCE SACRED HEART MEDICAL CENTER, and KAVITHA CHAGANUR, <br><br> Defendants. | NO. 2:24-CV-0262-TOR <br><br> ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

BEFORE THE COURT are Defendant Providence Sacred Heart Medical Center's Motion for Summary Judgment (ECF No. 172), Defendant Kavitha Chaganur's Motion for Summary Judgment (ECF No. 175), and Plaintiff's Motion for Summary Judgment (ECF No. 179). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Defendant

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 1

Providence Sacred Heart Medical Center's Motion for Summary Judgment (ECF No. 172) is **GRANTED in part and DENIED in part**; Defendant Kavitha Chaganur's Motion for Summary Judgment (ECF No. 175) **is GRANTED in part and DENIED in part**; and Plaintiff's Motion for Summary Judgment (ECF No. 179) is **DENIED**.

## BACKGROUND

This action arises out of the death of Plaintiff's spouse, Robbie Tackett ("Ms. Tackett"), on July 31, 2019. ECF No. 148 at ¶ 6. Ms. Tackett was first diagnosed with heart failure in 2018 by Dr. William Highfill and underwent medical therapy for her cardiac condition. ECF Nos. 177 at ¶¶ 5,6, 184 at ¶¶ 5,6. Ms. Tackett was admitted to Providence Sacred Heart Medical Center ("PSHMC") from November 1 to November 4, 2018, following an acute stroke where she received care related to the stroke. ECF No. 180 at 2. While Ms. Tackett was admitted, Dr. Kavitha Chaganur ("Dr. Chaganur") was the attending provider for Ms. Tackett from November 2, 2018 through November, 4 2018. ECF No. 177 at ¶ 9. Dr. Chaganur is a board-certified internal medicine specialist at PSHMC responsible for coordinating patient care. ECF No. 177 at ¶¶ 1,2, 184 at ¶¶ 1,2. During her admission, Ms. Tackett also received care from PSHMC's cardiology team, including Dr. Timothy Ball ("Dr. Ball"), due to Ms. Tackett's pre-existing cardiac condition of cardiomyopathy. ECF No. 174 at ¶ 3.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 2

Prior to Ms. Tackett's discharge on November 4, 2018, the cardiology providers recommended she follow up with her primary cardiologist in Montana. ECF Nos. 174 at ¶ 5, 180 at ¶ 5.  Eight months after Ms. Tackett was discharged, she died on July 31, 2019.  ECF No. 177 at ¶ 17.

Plaintiff filed his original complaint on March 31, 2021 in the United States District of Montana alleging claims, including medical malpractice, against various Montana and Washington defendants, including PSHMC and Dr. Chaganur.  ECF No. 1.  On July 29, 2024, the Montana District Court severed Plaintiff's claims against PSHMC and Dr. Chaganur and transferred them to the Eastern District of Washington.  ECF Nos. 123, 124.  On May 3, 2025, proceeding *pro se*, Plaintiff filed a Second Amended Complaint ("SAC") against PSHMC and Dr. Chaganur alleging claims of medical negligence for breaching the applicable standard of care under RCW 7.70.030, .040.  ECF No. 148 at ¶¶ 36-39.

**DISCUSSION**

PSHMC and Dr. Chaganur both now move for summary judgment as to Plaintiff's respective claims against them.  ECF Nos. 172, 175.  Plaintiff also moves for summary judgment in opposition to PSHMC's summary judgment motion.  ECF No. 179.

//

//

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 3

### A. Summary Judgment Standard

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court must only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 4

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B. PSHMC's Motion for Summary Judgment

PSHMC moves for summary judgment on Plaintiff's negligence, lack of informed consent, and corporate negligence claims on the basis Plaintiff has failed to produce the requisite expert testimony for such claims. ECF No. 172 at 2-3.

### a. Medical negligence

To establish a prima facie case for medical malpractice in Washington, a plaintiff must show (1) the applicable standard of care, (2) a breach of that standard of care, and (3) that the breach proximately caused the injury suffered by the plaintiff. RCW 7.70.040. The applicable standard of care is "that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." *Id.* A plaintiff generally must use expert testimony to establish the applicable standard of care in medical malpractice actions. *Reyes v. Yakima Health Dist.*, 191 Wash. 2d 79, 86 (2018). This requires "an expert to say what a reasonable doctor would or would not have done, that the [defendants] failed to act in that manner, and that this failure caused [the] injuries." *Keck v. Collins*, 184 Wash. 2d 358, 371 (2015).

In this case, Plaintiff specifically alleges PSHMC is vicariously liable for Dr. Chaganur and Dr. Ball's breached duty of care to Ms. Tackett by failing to diagnose a high risk of sudden cardiac death ("SCD"), inform Ms. Tackett of the SCD risk, and provide follow-up care and recommendations for an implantable cardiac defibrillator ("ICD").  ECF No. 148 at ¶¶ 7,37.

    i.     *Washington's standard of care*

PSHMC first argues that Plaintiff lacks appropriate expert testimony to establish both the applicable standard of care for health professionals in Washington and that a causal link exists between PSHMC's conduct and Ms. Tackett's death.  ECF No. 172 at 8-9.  Plaintiff responds that he has produced such expert testimony from Dr. Alexander Marmureanu ("Dr. Marmureanu") who opined that the applicable standard of care required diagnosis of the risk of SCD, monitoring, warning, and electrophysiology referral, and that PSHMC's cardiologists breached that standard of care.  ECF No. 179 at 6-7.

PSHMC replies that Dr. Marmureanu is not qualified to opine on the standard of care applicable in Washington because he is not licensed to practice in Washington and is not familiar with the standard of care for Washington cardiologists and hospitalist physicians.  ECF No. 186 at 2-6.  PSHMC additionally argues that Dr. Marmureanu has not confirmed the Washington standard of care mirrors the national guidelines using the methods identified *Boyer v. Morimoto*, 10

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 6

Wash. App. 2d 506 (2019).

The Washington Court of Appeals held in *Boyer* that where a nonresident physician declares that the Washington standard of care conforms with the national standard, the physician must "provide underlying facts identifying a background that substantiates" such knowledge. *Id.* at 524. In that case, the allegation of medical malpractice arose from cosmetic surgery. The plaintiff's expert submitted a declaration stating that the care for plastic surgeons is "not unique to the State of Washington and applies on a nationwide basis." *Id.* at 513. In affirming the trial court's rejection of the expert declaration, the appeals court explained that it "did not qualify him to testify to the standard of care in Washington State" because he "failed to disclose how he knew Washington's standard to equate to a national standard." *Id.* at 524. Thus, under *Boyer*, an "expert must provide some underlying support for his opinion that the state standard follows the national standard." *Id.*

However, the Washington Court of Appeals addressed the same issue after *Boyer* in *Chervilova v. Overlake Obstetricians & Gynecologists, PC*, 30 Wash. App. 2d 120 (2024). In *Chervilova*, the court held that a medical professional's testimony that "based on his training, education, and experience," he knows that Washington follows the national standard of care sufficiently demonstrates a familiarity with Washington's standard of care to qualify him as an expert. *Id.* at

127; *see also Campanelli v. PeaceHealth Sw. Med. Ctr.*, 34 Wash. App. 2d 24, 39 (2025) ("A witness need only opine on the standard and show that they are qualified to render their opinion by knowledge, skill, experience, training, or education."). The court reasoned that such a showing of familiarity was a preliminary issue of fact that must be viewed in the light most favorable to the nonmoving party. *Id.* at 127. Thus, for purposes of summary judgment, a court may infer that an expert is familiar with Washington's standard of care where they opine that it follows the national standard.

The Washington Court of Appeals reiterated *Chervilova*'s reasoning a year later in *Campanelli* where it held that an expert's opinion that Washington neurosurgeons followed the national standard of care was sufficient to demonstrate familiarity because "we can infer that like the expert in *Chervilova*, he knows that the standard of care for neurosurgeons in Washington is the same as the national standard of care through extensive training, education, and experienced detailed in his declaration." *Campanelli*, 34 Wash. App. 2d at 39.

In this case, Dr. Marmureanu is board certified in cardiothoracic surgery and general surgery and is licensed in California and New York. ECF No. 179-4. Dr. Marmureanu opines that the American College of Cardiology/American Heart Association Guidelines ("ACC/AHA") set the standard of care for treating Ms. Tackett's medical condition. *Id.* at 5-6. Additionally, one of the several provided

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 8

expert reports from Dr. Marmureanu states:

> I have served as an expert witness in legal proceedings across multiple jurisdictions, including the State of Washington. I have reviewed medical records, authored expert reports, and testified at deposition and trial regarding cardiology and cardiovascular surgery, hospital standards, and standard-of-care determinations.
>
> I am fully qualified to render expert opinions on the standard of care applicable to physicians and healthcare facilities operating in Washington. I am familiar with the medical, ethical, and institutional standards applicable to cardiovascular care in Washington, and I understand how these standards are implemented by reasonably prudent physicians in that state.
>
> The standard of care governing cardiovascular diagnosis, surgical treatment, interdisciplinary coordination, and patient management is based on national clinical guidelines—most notably those issued by the American College of Cardiology and the American Heart Association—as well as peer-reviewed literature and recognized accreditation standards. These standards do not materially vary by geographic region and are applied uniformly in California, New York, Washington, and throughout the United States.

ECF No. 179-8 at 1-2.

The Court finds that under *Chervilova*, Dr. Marmureanu has adequately demonstrated his familiarity with the Washington standard of care.

ii.    *Standards of care as to cardiologists and internal medicine specialists*

PSHMC next contends that Dr. Marmureanu cannot opine as to the standard of care applicable to Dr. Ball and Dr. Chaganur because he is not within the same specialty and has not demonstrated familiarity with the standard of care as to a cardiologist or internal medicine specialist. ECF No. 186 at 4-6. PSHMC argues

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 9

that Plaintiff's reliance on the following quote from *Hill v. Sacred Heart Medical Center*, 143 Wash. App. 438, 447 (2008) is misplaced because it relates to causation, not a physician specialist's ability to testify against any other physician specialist by virtue of holding a medical degree.  ECF No. 186 at 4.

> A physician with a medical degree is qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue in the medical malpractice action.

*Hill*, 143 Wash. App. at 447.

While PSHMC is correct that the issue in *Hill* related to causation, the same rule applies with regard to a specialist's ability to testify on the standard of care of another specialist.

> In *White,* we considered whether an ear, nose, and throat specialist's testimony regarding the standard of care of a general practitioner could satisfy a plaintiff's summary judgment burden.  In reversing summary judgment, we said that so long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, ordinarily the physician "will be considered qualified to express an opinion on any sort of medical question including questions in areas in which the physician is not a specialist."

*Morton v. McFall*, 128 Wash. App. 245, 253 (2005) (quoting *White v. Kent Med. Ctr., Inc.*, 61 Wash. App. 163, 173 (1991)).

The medical problem at issue in this case was Mr. Tackett's pre-existing cardiac condition of cardiomyopathy and congestive heart failure, her SCD, and

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 10

her candidacy for an ICD or CRT.  ECF Nos. 188 at ¶ 3, 173-at at 4, 179 -5 at 1-2. Dr. Marmureanu has "over 25 years of experience in the diagnosis, surgical management, and prevention of cardiac conditions including heart failure, arrhythmias, and sudden cardiac death (SCD)."  ECF No. 179-5 at 1.  The Court concludes Dr. Marmureanu is qualified to opine on the standard of care applicable to do a cardiologist and internal medicine specialist as they relate to the medical issues in this case.

> *iii.    Causation*

PSHMC next argues that Dr. Marmureanu's opinion that PSHMC's breach of duty proximately caused Ms. Tackett's death is insufficient to raise an issue of fact as to causation.  ECF No. 186 at 6-8.  Specifically, PSHMC argues that Dr. Marmureanu fails to specify how PSHMC's actions it did take were insufficient and proximately caused Ms. Tackett's death eight months after she was discharged, and that a general assertion that this was a "missed opportunity for *potentially* life-saving intervention" is insufficient.  ECF No. 186 at 7.  Plaintiff responds that issues of fact exist as to Dr. Ball and Dr. Chaganur's negligence, therefore, PSHMC's vicarious liability cannot be resolved on summary judgment.  ECF No. 179 at 3.

PSHMC does not dispute that it may be vicariously liable for the actions of Dr. Ball or Dr. Chaganur, therefore, Plaintiff's claim against PSHMC survives

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 11

summary judgment only if facts exist to support a jury finding that Dr. Chaganur or Dr. Ball were medically negligent.  Dr. Chaganur has filed a separate summary judgment motion similarly arguing that Plaintiff has failed to raise an issue of fact as to causation, accordingly those arguments will be addressed here.

**Dr. Chaganur**

Like PSHMC, Dr. Chaganur argues that Dr. Marmureanu is not qualified to testify on the applicable standard of care as it applies to an internal medicine physician in Washington.  ECF No. 192 at 3-8.  As the Court already concluded, Dr. Marmureanu is qualified to opine on the applicable standard of care as to an internal medicine physician.  Thus, only the issue of causation remains.

"A proximate cause of an injury is a cause which, in a direct sequence that is unbroken by any new independent cause, produces the injury complained of and without which such injury would not have happened." *Hill*, 143 Wash. App. at 448.  Proximate cause has two components, factual causation and legal causation, of which both must be met.  *Id.*  Factual causation requires a plaintiff to show that but for the health provider's breach of the standard of care, he or she would not have been injured.  *Id.*

Dr. Chaganur contends that Plaintiff has failed to come forward with expert testimony to establish a causal relationship between Dr. Chaganur's actions during Ms. Tackett's admission and Ms. Tackett's death.  ECF No. 175 at 10.  Plaintiff

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 12

contends that his expert, Dr. Marmureanu, opines that Ms. Tackett's cause of death was more likely than not from SCD due to a fatal arrhythmic event and PSHMC, Dr. Chaganur, and Dr. Ball's departure from the standard of care resulted in her death. ECF No. 183 at 8. Plaintiff also asserts that Dr. Marmureanu's opinion on Ms. Tackett's cause of death is supported by the autopsy report and deposition of the medical examiner, Dr. William Ralston ("Dr. Ralston"). *Id.* Plaintiff asserts Defendants have not challenged Dr. Marmureanu's opinion on the cause of death. *Id.* Dr. Chaganur argues that Dr. Ralston did not conclusively determine that Ms. Tackett died from an abnormal arrhythmia. ECF No. 192 at 9-10.

Dr. Ralston's autopsy report attributed Ms. Tackett's death to cardiomegaly. ECF No. 183-6 at 1. During his deposition, Dr. Ralson defined cardiomegaly as an enlarged heart and noted that the condition occurs over months or years. ECF No. 183-7 at 3. Dr. Ralston testified that having an enlarged heart presents as a risk factor for an abnormal arrythmia and explained that "more commonly what we'll expect with a death due to an enlarged heart is the secondary to an arrhythmogenic event." *Id.* at 4. And while Dr. Ralston also testified that there could have been other potential causes of death, he believed cardiomegaly was "currently the most likely cause of death." *Id.* Thus, sufficient evidence exists to support a finding that Ms. Tackett died from a fatal arrhythmic event.

Dr. Chaganur also argues that Dr. Marmureanu does not sufficiently link Dr.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 13

Chaganur's actions to Ms. Tackett's death. ECF No. 192 at 8-9. Dr. Chaganur states that as an internal medicine specialist, her job involved coordinating patient care and involving the appropriate medical specialty consultants for specific patient problems. ECF No. 175 at 3. During Dr. Chaganur's deposition, she testified that while she is qualified to treat basic heart failure, complex heart failure, as was the case for Ms. Tackett, requires treatment by an advanced heart failure team and cardiology team. ECF No. 176-1 at 4-5. Dr. Chaganur testified that she followed the recommendations from neurology and cardiology teams regarding Ms. Tackett's treatment and her discharge was a coordinated decision that did not occur until all teams cleared it. ECF No. 176-1 at 10. Dr. Chaganur also testified that the focus on Ms. Tackett's treatment was for her stroke but acknowledged that Ms. Tackett was also a high-risk patient with her cardiomegaly of 20 percent. ECF No. 176-1 at 12-13. However, Dr. Chaganur testified that she did not consult Ms. Tackett about her SCD risk prior to discharge because it was not within her expertise. *Id.* at 13. Rather, Dr. Chaganur states that Ms. Tackett was instructed to follow up with her primary cardiologist in Montana after discharge. ECF No. 192 at 9.

Dr. Marmureanu opines that as an attending hospitalist responsible for the discharge of a patient, Dr. Chaganur had an independent duty to (1) "recognize clinically significant, life-threatening cardiac risk;" (2) "[e]nsure appropriate

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 14

escalation of care when such risk is present;" (3) "[c]ommunicate material risks to the patient;" and (4) "[e]nsure discharge planning consistent with the patient's risk profile and wishes." ECF No. 185-5 at 1. Dr. Marmureanu contends that it is well known that board-certified internists routinely deal with patients with heart failure similar to that of Ms. Tackett and "are expected to recognize when such conditions place a patient at foreseeable risk of sudden cardiac death." *Id.* Dr. Marmureanu opines that Ms. Tackett presented with a number of well-established indicators of a high risk of SCD and that recognition of such risk "does not require cardiology board certification; it falls squarely within the competency of a reasonably prudent board-certified internist serving as an attending physician." *Id.* at 2.

Dr. Marmureanu argues that despite the extreme risk present, "No electrophysiology consultation was obtained; No ICD or CRT [cardiac resynchronization therapy] candidacy evaluation was initiated; No documented plan for timely electrophysiology evaluation existed; and No documentation reflects that this life-threatening risk was communicated to the patient prior to discharge." *Id.* Dr. Marmureanu opines that the "failure to refer Mrs. Tacket to an electrophysiologist for evaluation and implementation of ICD and CRT therapy, as recommended by ACC/AHA guidelines, constituted a gross deviation from the standard of care," and that "[w]ith the appropriate interventions, including ICD and CRT, Mrs. Tackett's risk of sudden cardiac death would have been substantially

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 15

reduced, and it is more likely than not that her life could have been saved." ECF No. 179-4 at 9.

Dr. Marmureanu further contends that even though Dr. Chaganur coordinated with neurology and cardiology in discharging Ms. Tackett, Dr. Chaganur had primary responsibility over Ms. Tackett as the hospitalist and "the standard of care does not permit an attending hospitalist to discharge a patient with a known, unmitigated risk of sudden cardiac death on the assumption that another provider might address the risk at an unspecified later time." ECF No. 183 at 2.

Dr. Marmureanu also opines that a reasonable patient, like Ms. Tackett, would not have agreed to be discharged without electrophysiology evaluation and would have accepted the recommended placement of an ICD or CRT had they been informed of the elevated risk of SCD. ECF No. 185-5 at 4. Had such placement occurred, Dr. Marmureanu opines that Ms. Tackett would probably be alive today. *Id.* Instead, Dr. Marmureanu states that "Providence records contain no documentation that Mrs. Tackett was informed of her elevated risk, no documentation that ICD or CRT therapy was discussed, and no documentation that she participated in any decision to defer electrophysiology evaluation." ECF No. 183-5. Thus, Dr. Marmureanu concludes that Dr. Chaganur's discharging of Ms. Tackett under the circumstances was a departure from the standard of care and was "a proximate cause of Mrs. Tackett's sudden cardiac death and, at minimum,

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 16

caused a loss of chance of survival." *Id.* at 5.

Dr. Marmureanu also addresses the length of time between Ms. Tackett's hospitalization at PSHMC and her death.

> Apparently, defendants argue that causation is speculative because Mrs. Tackett died months after discharge. That argument reflects a basic misunderstanding of sudden cardiac death and the purpose of ICD therapy.
>
> Sudden cardiac death risk in patients with severe cardiomyopathy is ongoing and cumulative. It does not dissipate with time unless it is mitigated. In Mrs. Tackett's case, the risk identified during the Providence admission was never mitigated. No electrophysiology evaluation occurred. No ICD or CRT pathway was initiated. No informed decision-making took place regarding preventive therapy.
>
> In my prior reports, I identified the mechanism of injury as fatal ventricular arrhythmia occurring in the setting of untreated high-risk cardiomyopathy. I further stated, to a reasonable degree of medical certainty, that had appropriate evaluation and preventive therapy occurred, Mrs. Tackett, more likely than not, would have survived.

ECF No. 179-7 at 3.

The Court concludes Plaintiff's expert has sufficiently raised an issue of fact on the element of causation as it applies to Dr. Chaganur.

**Dr. Ball**

Issues of fact also exist as to whether Dr. Ball was medically negligent. Dr. Ball testified that Ms. Tackett was not a candidate for ICD therapy due to a number of contraindications including decompensated heart failure, stroke, and myocardial infarction. ECF No. 173 at 3,4.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 17

However, Dr. Marmureanu disagrees and opines that based on Ms. Tackett's medical records, when she was admitted to PSHMC, she "presented with multiple clinical indicators that strongly qualified her for ICD and CRT therapy under the ACC/AHA guidelines."  ECF No. 179-4 at 5-6.  Dr. Marmureanu provides multiple reports with highly detailed discussions on Ms. Tackett's medical condition and the proper standard of care in treating such a condition, including available treatments and why Ms. Tackett was a prime candidate for such treatments.  ECF Nos. 179-4, 179-5, 179-6, 179-7, 179-8, 179-9.

Dr. Marmureanu additionally opines that even if an immediate device implantation was not appropriate at that time, "the standard of care still required recognition of elevated sudden cardiac death risk, disclosures of that risk to the patient, and timely electrophysiology evaluation or referral for ICD and/or CRT candidacy."  ECF No. 179-7 at 3.  Failure to do so resulted in a deviation from the standard of care, and Dr. Marmureanu opines such deviation contributed to Ms. Tackett's death because she was discharged with a known, unmitigated risk of fatal arrhythmia.

Based on the provided evidence and expert testimony, the Court concludes that Plaintiff has sufficiently linked Ms. Tackett's death to Dr. Chaganur and Dr. Ball's alleged breaches of care to avoid summary judgment dismissal of his vicarious liability claims against PSHMC.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 18

**b. Informed consent**

PSHMC contends Plaintiff has failed to raise an issue of fact as to his informed consent claim.  ECF No. 172 at 10.  "Informed consent focuses on the patient's right to know his or her body's condition and to decide what should be done about it."  *Alexander v. Gonser*, 42 Wash. App. 234, 237 (1985).  It includes a duty to disclose "[w]henever a physician becomes aware of an abnormality which may indicate risk or danger in the patient's body."  *Id.*  Pursuant to RCW 7.70.050, a plaintiff bringing an informed consent claim must prove:

> (1) the health care provider failed to inform the patient of a material fact relating to treatment; (2) the patient consented to treatment without being aware of that fact; (3) a reasonably prudent patient under similar circumstances would not have consented given such information; and (4) the treatment in question proximately caused injury to the patient.

*Id.*

PSHMC argues that it owed no informed consent duty independently to Ms. Tackett, nor did Dr. Chaganur or Dr. Ball.  ECF 186 at 8.

Plaintiff's claims of informed consent rests on his argument that discharge is a medical decision that requires informed consent where discharge exposes a patient to a known material risk of death.  ECF No. 183 at 9.  Plaintiff argues that Dr. Marmureanu opines that the standard of care in Ms. Tackett's case required disclosure.  *Id.*  However, this argument falls within the scope of Plaintiff's

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 19

medical negligence claim, not a claim for informed consent. Informed consent is implicated where a "health care provider failed to inform the patient of a material fact relating to *treatment*." RCW 7.70.050. "The statute clearly uses the word 'treatment,' demonstrating the intent to limit informed consent claims to treatment situations." *Gomez v. Sauerwein*, 180 Wash. 2d 610, 617 (2014). Discharging a patient is not a treatment pursuant to RCW 7.70.050, and Plaintiff does not allege another course of treatment where the related risks created a duty to disclose by any Defendant. Therefore, Plaintiff's informed consent claims are dismissed with prejudice.

### c. Corporate negligence

Plaintiff brings a corporate negligence claim under the allegation that PSHMC "failed to provide policies, guidelines or directives to its employee health care providers for diagnosing and treating patients with high risk of SCD." ECF No. 148 at ¶ 11.

PSHMC argues Plaintiff's corporate negligence claim fails because he lacks the requisite expert testimony. ECF No. 172 at 13-14. The doctrine of corporate negligence "imposes on [a] hospital a nondelegable duty owed directly to the patient, regardless of the details of the doctor-hospital relationship." *Pedroza v. Bryant*, 101 Wash. 2d 226, 229 (1984). The standard of care for a hospital "is that of an average, competent health care facility acting in the same or similar

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 20

circumstances." *Est. of Essex v. Grant Cnty. Pub. Hosp. Dist. No. 1*, 3 Wn. 3d 1, 14 (2024) (citation omitted).  While a hospital's standard of care is usually established by expert testimony, it may be defined by the accreditation standards of the Joint Commission on Accreditation of Hospitals, the hospital's own bylaws, or by statute.  *Douglas v. Freeman*, 117 Wash. 2d 242, 248 (1991).

Plaintiff's corporate negligence claim rests on the allegation that PSHMC lacks "policies, systems, and discharge safeguards necessary to identify and treat patients at high risk of sudden cardiac death ("SCD")."  ECF No. 179 at 5.  To establish the applicable standard of care, Plaintiff relies on testimony of PSHMC's Rule 30(b)(6) designee, the Joint Commission accreditation standards, and expert testimony.  *Id.* at 8-10, 13-17.

First, Plaintiff argues that PSHMC's Rule 30(b)(6) designee testified that he was familiar with the standard of care applied at PSHMC and it was the same applied nationally.  ECF No. 179.  PSHMC responds that the designee said no such thing.  However, a review of deposition transcript reveals that the designee made an assumption that it was a national standard.

> Q. (By Mr. Tackett) To your knowledge, was the standard of hospital administration applied at Providence the same standard that was applied across the nation by similar facilities treating similar patients at a similar level of care?
>
> The Witness: I don't know.  I mean I would assume so.  I would hope so.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 21

. . .

Q. (By Mr. Tackett) Does Providence, through its corporate officers and governing boards have responsibility for ensuring that all care providers at its facilities meet the applicable national standard of care?

The Witness: I would assume so.

. . .

Q. (By Mr. Tackett) . . . in your opinion, does Providence agree that all patients, regardless of insurance or financial status, are entitled to receive care consistent with the national standard of care?

The Witness: Yes.

ECF No. 179-9 at 2, 13, 16.

Plaintiff additionally provides expert testimony from Dr. Marmureanu that PSHMC had a "clinical duty to provide guideline-based cardiac care in a high-risk patient" and opined on the applicable standard of care based on national clinical guidelines:

The standard of care in this setting required an inpatient electrophysiology consultation to evaluate candidacy for ICD and/or CRT, clear documentation of a device placement plan—whether inpatient or with a confirmed outpatient procedure—and avoidance of unsafe delays, recognizing the logistical challenges and potential dangers of deferring device placement to the outpatient setting.

As a tertiary cardiovascular referral center, Providence Sacred Heart was also obligated to meet a higher standard of multidisciplinary management, integrating its specialized cardiac services into the patient's discharge planning.

ECF No. 179-6 at 2.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 22

Dr. Marmureanu opines that even though Ms. Tackett was admitted for a stroke, "when a life-threatening condition is identified during an admission, the standard of care requires that it be addressed appropriately or escalated before discharge." ECF No. 179-7 at 2. In this case, Dr. Marmureanu argues that PSHMC records contained no documentation that Ms. Tackett was informed of her elevated risk of SCD or that ICD or CRT therapy was discussed prior to her discharge which was a deviation from the applicable standard of care. *Id.*

> The materials reviewed reflect the absence of institutional mechanisms to identify high-risk sudden cardiac death patients, to ensure electrophysiology referral when indicated, to prevent unsafe discharge of patients with severe cardiomyopathy, and to conduct meaningful quality review when a patient dies outside the hospital. Hospitals that provide tertiary-level cardiac care are expected to have systems in place to prevent exactly this type of outcome.

> In my opinion, Providence Sacred Heart Medical Center failed to meet these institutional responsibilities in Mrs. Tackett's case, and this systemic failure directly contributed to the absence of life-saving intervention.

ECF No. 179-7 at 4.

PSHMC argues that Plaintiff's expert had previously explained in a prior deposition from 2023 that a medical facility is not required to have a policy or procedure on when a provider needs to refer a patient to electrophysiology or in general. ECF No. 186 at 10. However, the Court agrees with Plaintiff that this goes to the weight of Plaintiff's expert testimony, not its admissibility.

PSHMC also contends that Dr. Marmureanu's opinion does not express familiarity with the standard of care applicable to a Washington hospital. ECF No. 186 at 10-11. The Court again disagrees. Dr. Marmureanu states that he is familiar of the standard of care applicable to healthcare facilities operating in Washington and "with the medical, ethical, and institutional standards applicable to cardiovascular care in Washington." ECF No. 179-8 at 1. Dr. Marmureanu opines that the applicable standard of care "is based on national clinical guidelines—most notably those issued by the American College of Cardiology and the American Heart Association—as well as peer-reviewed literature and recognized accreditation standards." ECF No. 179-8 at 1-2. Moreover, PSHMC's own Rule 30(b)(6) witness appears to concede that PSHMC follows a national standard of care.

PSHMC next argues that Plaintiff has not presented evidence or argument that any alleged corporation violation caused harm. ECF No. 186 at 11. Plaintiff's expert opines that prior to discharge, PSHMC had an obligation to inform Ms. Tackett's of her "elevated risk of sudden cardiac death, the potential for device therapy to mitigate that risk, or the logistical and safety consequences of deferring implantation." ECF No. 179-6 at 3. Dr. Marmureanu states that PSHMC's failure to meet its institutional responsibilities "directly contributed to the absence of life-saving intervention." ECF No. 179-7 at 4.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 24

Plaintiff's expert testimony presents sufficient evidence to preclude summary judgment on his corporate negligence claim.  PSHMC's motion for summary judgment is granted in part and denied in part.

**C. Dr. Chaganur's Motion for Summary Judgment**

Dr. Chaganur moves for summary judgment on Plaintiff's medical negligence claim and informed consent claim.  ECF No. 175 at 8-10, 11.  The Court has already summarily dismissed Plaintiff's informed consent claims and concluded that Plaintiff raised issues of fact as to preclude summary judgment on Dr. Chaganur's medical negligence claim.  Therefore, Chaganur's motion for summary judgment is granted in part and denied in part.

**D. Plaintiff's Motion for Summary Judgment**

Plaintiff filed his opposition to PSHMC's motion as a summary judgment motion but does not make any argument for summary judgment on his claims.  However, even if he did, issues of fact preclude summary judgment.  Therefore, his motion is denied.

//

//

//

//

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant Providence Sacred Heart Medical Center's Motion for Summary Judgment (ECF No. 172) is **GRANTED in part and DENIED in part**.

2. Defendant Kavitha Chaganur's Motion for Summary Judgment (ECF No. 175) is **GRANTED in part and DENIED in part**.

3. Plaintiff's Motion for Summary Judgment (ECF No. 179) is **DENIED**.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

DATED **April 1, 2026.**



THOMAS O. RICE
United States District Judge

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 26